**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

WILLIE MACON,

     Plaintiff,

vs.                               CASE NO.:

BARK PARK AT DOG DAYZ
CAFE, LLC                 INJUNCTIVE RELIEF SOUGHT
Florida Limited Liability Company
d/b/a DOG DAYZ CAFE

     Defendant(s).

## **COMPLAINT**

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues BARK PARK AT DOG DAYZ CAFE, LLC, Florida Limited Liability Company, d/b/a DOG DAYZ CAFE ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1

1.      This action arises from Defendant's failure to make Defendant's online platform located at www.dogdayzcafe.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2.      MACON files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.      Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4.      This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.      Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6.    Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7.    Further, Defendant operates a Principal Place of Business with a physical address of 3055 Dundee Rd, Winter Haven, FL 33884 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8.    MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

**PARTIES**

9.    MACON is a natural person over the age of 18 and is blind.

3

10.    MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11.    MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12.    MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an

4

arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.    MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14.    MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15.    Defendant is a Florida Limited Liability Company with a principal place of business of 3055 Dundee Rd, Winter Haven, FL 33884 (hereinafter "Defendant's Principal Place of Business").

16.    Defendant is a food and beverage establishment operating under the name Dog Dayz Cafe, located at Defendant's Principal Place of Business within the premises of Veterinary Healthcare Associates. Defendant operates Defendant's Website to promote its business and facilitate commerce, including through an

online ordering platform and delivery services available to the public. Through Defendant's Website, customers may access Defendant's menu offerings, which include breakfast items, wraps, flatbreads, salads, espresso, coffee, tea, lemonades, and smoothies, as well as seasonal specials featuring locally sourced ingredients. =In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates at Defendant's Principal Place of Business where it conducts its food and beverage operations and serves the surrounding community. Defendant's Website functions as a digital extension of Defendant's Principal Place of Business, providing consumers with access to Defendant's menu offerings, online ordering capabilities, and delivery services that mirror and supplement the goods and services available at Defendant's Principal Place of Business. Through

6

Defendant's Website, Defendant markets and makes available its products and services to consumers nationwide, extending the reach of its physical business operations beyond the local Winter Haven community. Defendant's Website is owned, controlled, and operated by Defendant in direct connection with its principal place of business, serving as an integral component of Defendant's overall commercial enterprise. The goods and services advertised and offered through Defendant's Website are the same goods and services provided at Defendant's physical location, thereby establishing a substantial nexus between Defendant's Website and Defendant's Principal Place of Business.

20.    At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.    MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.    Defendant's Website serves as a direct digital extension of Defendant's Principal Place of Business, providing consumers with access to the same goods and services available at Defendant's brick-and-mortar location in Winter Haven, Florida. Defendant's Website offers consumers the ability to browse Defendant's full menu of food and beverage offerings, including breakfast items, wraps, flatbreads, salads, espresso, coffee, tea, lemonades, and smoothies, thereby replicating the commercial experience available at Defendant's Principal Place of Business. Defendant's Website further provides consumers with Defendant's operational business hours, specifically Monday through Friday from 8:00 a.m. to 3:00 p.m., enabling consumers to plan and coordinate their patronage of Defendant's Principal Place of Business. Defendant's Website also publishes Defendant's contact information, including Defendant's telephone number and email address, facilitating direct consumer communication with Defendant's physical establishment. Additionally, Defendant's Website supports an online ordering platform and delivery services, functions that are inextricably tied to and dependent upon the operations conducted at Defendant's Principal Place of Business. Through these features, Defendant's Website operates as an integrated component of Defendant's overall

commercial enterprise, connecting consumers to Defendant's physical location and the goods and services offered therein.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. March 13, 2026;

b. April 10, 2026;

c. April 25, 2026;

d. May 11, 2026;

e. May 26, 2026;

f. May 28, 2026;

g. June 12, 2026;

h. June 30, 2026 and

i. July 15, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered,

10

and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on April 10, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or

11

January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.    Congress found, among other things, that:

a.    some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.    historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.    discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.    individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

12

e.   the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34.   Congress explicitly stated that the purpose of the ADA was to:

a.   provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b.   provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c.   invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35.   Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages

13

or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 8.

38.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40.     Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41.     Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42.    There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to search and utilize Defendant's Website to access Defendant's menu offerings, place online orders, review business hours, and obtain contact information from the comfort of one's home are important accommodations for visually disabled individuals because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43.    Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44.    The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

16

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the

good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.    According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.    Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled,

18

and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    a. **Missing alt text for Nutritious conscious & delicious image link**

        i. **Issue:** The image link identified as "Nutritious conscious & delicious" lacks descriptive alt text, rendering it inaccessible to users who rely on assistive technologies. Without alt text, the purpose and destination of the image link are entirely undisclosed, creating an insurmountable barrier for screen reader users who are unable to interpret or interact with the link in any meaningful way.

19



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or visually impaired and rely on screen readers, the absence of alt text on this image link means they receive no information about the nature of the image or the destination of the link. This complete lack of context prevents blind users from making informed navigation decisions, effectively excluding them from accessing content that sighted users can readily perceive. Every image link must carry clear and meaningful alt text that communicates the link's purpose, ensuring equitable access for all users regardless of visual ability.

b.     **Missing new window indication for links**

i.   **Issue:** Certain links on the page, including "Map", "Instagram", and "Facebook", open in a new browser window without providing any prior warning or indication to

20

the user. Users are given no notification that their browsing context is about to change, which may cause significant disorientation, particularly for those navigating by keyboard or screen reader who rely on predictable and clearly communicated interaction behaviors.



ii.  **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii.  **Impact:** For users who are blind and navigate exclusively through screen readers, the unexpected opening of a new browser window without prior announcement creates serious confusion and loss of orientation. Blind users depend on their screen reader to convey all contextual changes in the interface; when a new window opens silently, they may be unaware of the context shift, lose their place in the navigation flow, and struggle to return to their previous location. Links

21

that trigger new windows must clearly communicate this behavior through accessible labels or visible text such as "opens in a new window," ensuring blind and keyboard-dependent users retain full control over their browsing experience.

### c.   Duplicate focus on links

i.  **Issue:** During keyboard and screen reader navigation, users encounter duplicate focus stops on links such as "Sustainability initiatives," requiring them to navigate through the same element twice before interaction is possible. The initial focus stop does not permit meaningful interaction, compelling the user to advance focus again to activate the same link. This redundant focus behavior obscures which element is currently active, disrupts the logical navigation sequence, and prevents users from efficiently accessing available options.



ii.  **WCAG 2.1 AA Violations:** 2.4.3 - A, 4.1.2 - A - Focus Order

iii.  **Impact:** For users who are blind and depend entirely on screen readers and keyboard navigation, duplicate focus stops introduce significant confusion and inefficiency. Blind users rely on a single, predictable focus announcement per element to understand the structure and interactivity of a page. When focus lands on the same link twice, the screen reader may announce conflicting or redundant information, making it impossible for the user to determine which element is active or ready for interaction. This barrier can cause blind users to inadvertently skip critical links or become entirely disoriented within the page, undermining their ability to navigate independently and effectively.

d.      **Hidden Focusable Elements in the page.**

i.  **Issue:** During keyboard navigation, a number of hidden links and buttons become focusable and are announced by screen readers, despite not being visually rendered on the screen. Because these elements are not visible, users have no means of identifying where focus has been placed, what the element represents, or where activating it may lead. This condition creates a critical barrier for keyboard and screen reader users, who may inadvertently activate hidden links without any awareness of their purpose or function.



ii.  **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii.  **Impact:** For users who are blind and navigate using screen readers, the presence of hidden focusable elements is particularly harmful. Blind users construct their understanding of a page's layout and content entirely through screen reader announcements; when focus moves to a hidden

element, the screen reader may announce an incomplete, misleading, or entirely absent label, leaving the user with no meaningful information. This exposes blind users to the serious risk of unknowingly activating links or buttons with unknown destinations or consequences, fundamentally compromising their ability to navigate the page safely and independently. All focusable elements must be visually rendered when they receive focus, and any element not intended for interaction must be removed from the tab order entirely.

e.      **Hidden Focusable Elements in the page.**

i.  **Issue:** During keyboard navigation, a number of hidden links and buttons become focusable and are announced by screen readers, despite not being visually rendered on the screen. Because these elements are not visible, users have no means of identifying where focus has been placed, what the element represents, or where activating it may lead. This condition creates a critical barrier for keyboard and screen reader users, who may inadvertently activate hidden links without any awareness of their purpose or function.

25



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and navigate using screen readers, the presence of hidden focusable elements is particularly harmful. Blind users construct their understanding of a page's layout and content entirely through screen reader announcements; when focus moves to a hidden element, the screen reader may announce an incomplete, misleading, or entirely absent label, leaving the user with no meaningful information. This exposes blind users to the serious risk of unknowingly activating links or buttons with unknown destinations or consequences, fundamentally compromising their ability to navigate the page safely and independently. All focusable elements must be visually rendered when they receive focus, and any element not

26

intended for interaction must be removed from the tab order entirely.

**f.    Missing new window indication for link**

i.  **Issue:** The link labelled "Follow Dog Days on Instagram" opens in a new window without any prior warning or indication to the user. No programmatic or visible notification is provided to inform users that activating the link will trigger a new window. This absence of warning creates significant confusion, as users may believe they remain on the same page, leading to disorientation during navigation. Keyboard-dependent users and screen reader users are particularly affected, as no announcement of the contextual change is made by assistive technologies.



ii.  **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii.  **Impact:** For users who are blind and rely on screen readers, the absence of a new window warning means they receive no spoken indication that their browsing context has changed upon activating the link. This causes severe disorientation, as the user may be unaware that a new window has opened, making it difficult to return to the previous page or understand their current location. The lack of advance notice removes the user's ability to make an informed decision before clicking, effectively stripping blind and keyboard-dependent users of navigational control and autonomy.

g.    **Missing Skip to Main Content Link**

i.  **Issue:** The page does not include a "Skip to main content" link at the beginning of the page structure. As a result, keyboard and screen reader users are required to navigate through all repeated elements — including the header and navigation menus — on every page load before reaching the primary content. The absence of this bypass mechanism creates a significant navigational barrier, preventing users from efficiently accessing the main content of the page and

forcing unnecessary and repetitive interaction with non-essential elements.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind and navigate exclusively via keyboard or screen reader, the absence of a skip link means that every page visit requires sequential traversal of all header and navigation elements before reaching meaningful content. This imposes a substantial and cumulative burden, significantly slowing the user's ability to access information. Blind users in particular experience this as a critical barrier, as they cannot visually scan the page to locate content and must instead rely entirely on sequential focus order, making the omission of a skip link a serious impediment to independent and efficient use of the page.

h.      **Missing Role for Pickup Button**

29

i.  **Issue:** The pickup button lacks a defined ARIA role, preventing assistive technologies from identifying and conveying its interactive nature to users. Without a declared role, screen readers are unable to announce the element as a button, leaving users without the contextual information necessary to understand its purpose or function. Keyboard and assistive technology users may be unable to interact with the control in the expected manner, as the element's type and behavior are not programmatically communicated. This constitutes a critical accessibility barrier, as the control is effectively unidentifiable and unusable for affected users.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind and depend on screen readers to interpret interface elements, the absence of a defined role on the pickup button means the element may be

30

passed over entirely or announced in a manner that provides no actionable information. A blind user has no means of determining that the element is an interactive button, its intended function, or how to activate it. This renders the pickup button completely inaccessible to blind users, denying them equal access to a core interactive feature of the page and preventing independent task completion.

i.    **Duplicate focus on Options buttons**

i.  **Issue:** When navigating via keyboard or screen reader, users encounter duplicate focus stops on option buttons such as "Breakfast Sandwich." The initial focus placement does not permit direct interaction, requiring the user to navigate a second time to the same element before activation becomes possible. This redundant focus behavior creates confusion regarding which element is currently active or operable, imposes unnecessary additional navigation steps, and increases the risk that users will inadvertently bypass important options without realising they have done so.

31



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 4.1.2 - A - Focus Order

iii. **Impact:** For users who are blind and rely entirely on screen readers and keyboard navigation, encountering duplicate focus on the same button introduces significant confusion and cognitive burden. A blind user has no visual reference to determine which instance of focus is interactive, making it unclear when an element is ready for activation. This forces the user to navigate the interface multiple times to perform a single action, increasing the likelihood of missed options and errors. The duplication of focus undermines the reliability of the navigational experience and constitutes a meaningful barrier to independent and accurate use of the interface.

j.    **No feedback after activating menu links**

i. **Issue:** When users activate menu category links such as "Most Popular," "Breakfast," or "Smoothies," no programmatic

32

feedback is provided to screen readers following the interaction. Although a visual change occurs on the page, no spoken announcement is made and focus is not redirected to the updated content area. This absence of feedback creates an inaccessible experience for screen reader users, who are left without any confirmation that their action was successful or any indication of what content has changed as a result of their interaction.



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and depend entirely on screen reader output to understand the state and content of a page, the failure to provide any spoken feedback following the activation of a menu category link means the user receives no confirmation that their action produced a result. A blind user cannot perceive the visual change and, without

33

a programmatic announcement or focus shift, has no way of knowing whether the interaction succeeded, what content is now displayed, or where to continue navigation. This effectively prevents blind users from independently and accurately using the menu navigation system, constituting a serious barrier to equal access and task completion.

### k.      Focus Not Moving to Modal Dialog on Open

i.   **Issue:** When a modal dialog — such as "BREAKFAST SANDWICH" — opens following activation of the "Add to Order" button, keyboard and screen reader focus fails to transfer into the modal. Users remain focused on background elements, enabling unintended interaction with content beneath the modal overlay. Consequently, users may not perceive that the modal has opened, rendering meaningful interaction with the dialog content effectively impossible.



34

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and rely entirely on screen readers, the failure to shift focus into the modal dialog upon opening creates a critical barrier to access. Because focus remains anchored to background content, blind users receive no indication that a modal has appeared, leaving them unaware of its existence and unable to interact with its contents. This prevents the completion of essential tasks — such as customizing and adding items to an order — and effectively excludes blind users from meaningful participation in the ordering experience.

l. **No Feedback After Activating Menu Item Buttons**

i. **Issue:** Menu item buttons — such as "Breakfast Sandwich" — are not announced in a clear or distinguishable manner by screen readers. As users navigate through the menu, items are read without clear separation or contextual differentiation, making it impossible to determine which item is currently focused or selected. The absence of properly communicated role, name, and state information prevents users who rely on

35

assistive technology from navigating or operating the menu with any degree of confidence or accuracy.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.4.3 - A - Name Role Value

iii. **Impact:** For users who are blind and depend on screen readers as their primary means of navigation, the lack of clear and structured announcements for menu item buttons constitutes a severe accessibility failure. Without distinct identification of each item's name, role, and current state, blind users are unable to determine their position within the menu, ascertain which item is focused, or make informed selections. This renders the menu entirely unusable for blind individuals, denying them the ability to independently browse and select food items — a fundamental function of the interface.

36

51.     Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about April 3, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52.     More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53.     There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54.     Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55.    To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56.    Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57.    Here, however, MACON, through counsel, did send a pre-suit communication informing of the barriers to access on April 10, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58.    As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59.    Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60.    Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61.    MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62.    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a.    Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b.    Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily

39

accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A.    A declaration that Defendant's Website is in violation of the ADA;

B.    An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's

40

Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C.    An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.    An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.    An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F.    An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to

41

ensure effective communication for individuals who are visually disabled;

G.   An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.   An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.   An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.   An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a

statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.     An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.     Such other and further relief as the Court deems just and equitable.

Dated: August 5, 2026                Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**